IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| WILLIAM C. WEAVER, JR., ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 3:15-cv-00026 |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| CAROLYN W. COLVIN, ) | |
| Commissioner of Social Security, ) | |
| Defendant ) | By:    Joel C. Hoppe |
| ) | United States Magistrate Judge |

Plaintiff William C. Weaver, Jr., asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The case is before me by the parties' consent under 28 U.S.C. § 636(c)(1). ECF Nos. 6, 7. Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that substantial evidence supports the Commissioner's decision that Weaver is not disabled.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); 20 C.F.R. § 404.1520(a)(4). The applicant bears the burden of proof at steps one through four. *Hancock*, 667

F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Weaver filed an application for DIB on February 25, 2010, alleging disability caused by a protruding disc, arthritis, and pain in his back. Administrative Record ("R.") 149.[1] He claimed that his period of disability began on March 1, 2001, at which time he was thirty-eight years old, and his date last insured was December 31, 2006. *Id.* Disability Determination Services ("DDS"), the state agency, denied his claim at the initial and reconsideration stages. R. 149–60, 162–78. On October 28, 2011, Weaver appeared with counsel at an administrative hearing before ALJ Brian Rippel. R. 47–103. The ALJ heard testimony from Weaver, R. 58–88, and Andrew Beal, a vocational expert ("VE"), R. 90–101.

ALJ Rippel denied Weaver's claim in a written decision issued on December 6, 2011. R. 180–94. He found that Weaver had severe impairments of degenerative disc disease of the lumbar spine and obesity, but also found that Weaver's impairment of gout was non-severe. In addition, the ALJ determined that Weaver's medically determinable mental impairment of affective disorder did not cause more than a minimal limitation in Weaver's ability to perform basic mental work activities and was therefore non-severe. R. 185–86. The ALJ then determined that none of Weaver's severe impairments, alone or in combination, met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, in particular Listing 1.04 (disorders of the spine). R. 186.

---

[1] Weaver also applied for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. R. 320–22. From the record it appears, and counsel at oral argument confirmed, that Weaver abandoned his SSI application.

3

As to Weaver's residual functional capacity ("RFC"),[2] the ALJ determined that Weaver could perform light work,[3] except he could do only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, and no climbing of ladders, ropes, or scaffolds. R. 186–89. Based on this finding and the testimony of the VE, the ALJ concluded that Weaver was unable to perform any of his past relevant work, but could perform other jobs existing in the national economy, including cashier, gate keeper/lobby monitor, and ticket taker. R. 189–90. Therefore, the ALJ concluded that Weaver was not disabled. R. 190. Weaver sought review of ALJ Rippel's decision from the Appeals Council, which remanded the case for further consideration of the opinion of Thomas Wolanski, M.D., and to obtain supplemental testimony from a VE if necessary. R. 195–97.

On remand, ALJ Rippel held a second hearing on January 7, 2014, during which he heard testimony from Weaver, R. 108–21; Christopher Alexander, III, M.D., a medical expert, R. 121–31; and a VE, R. 131–47. On January 29, 2014, ALJ Rippel again denied Weaver's claim in a written decision. R. 16–44. He found that Weaver suffered from the same severe impairments of degenerative disc disease of the lumbar spine and obesity. He also found that Weaver suffered from obstructive sleep apnea, but did not consider this impairment for the purpose of Weaver's disability application because it was not diagnosed or treated until 2012, after the date last insured of December 31, 2006. R. 27. In addition, the ALJ found once again that Weaver's medically determinable mental impairment of affective disorder was non-severe. R. 22–25. ALJ Rippel

---

[2] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

[3] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 404.1567(b). A person who can meet these lifting requirements can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

determined that Weaver's severe impairments still did not rise to the level of a listed impairment. R. 25. He then found that, through the date last insured, Weaver had the RFC to perform light work, but was limited to lifting or carrying twenty pounds occasionally and ten pounds frequently, and to standing or walking for six hours and sitting for six hours in an eight-hour workday with an option to alternate to sitting after standing or walking for thirty minutes. He also found that Weaver had similar postural limitations as those he found in his first determination, and he further limited Weaver from exposure to unprotected heights. R. 26–36. Based on this finding and the VE's testimony, the ALJ concluded that Weaver was unable to perform any of his past relevant work, but could perform other jobs existing in the national economy representing light, unskilled occupations, such as parking lot cashier, storage facility rental clerk, or assembler of electrical accessories. R. 36–37. Therefore, the ALJ concluded that Weaver was not disabled. R. 37. Weaver again requested review by Appeals Council, which was denied. R. 8–10. This appeal followed.

### III. Statement of Facts

*A.     Relevant Medical Treatment Records*

*1.     Medical Records Before the Alleged Onset Date*

The Administrative Record contains medical records spanning from July 1994, R. 498–99, through January 2014, R. 893. The record prior to the alleged onset date of March 1, 2001, indicates Weaver injured his back in 1995 while lifting a steal beam at work. R. 498–99, 615. MRI scans from 1995, 1996, and 1999 are almost identical and show a disc herniation at L5-S1. R. 648–50, R. 612–14, 665–66.

In 1995 George N. Stergis, M.D., recommended conservative treatment consisting of physiotherapy and prescribed Skelaxin for Weaver's muscle spasms. R. 663–66. From 1995 to

1998, Weaver, in consultation with his medical providers, regularly stayed out of work for periods of weeks or even months because of flare ups in symptoms. In 1998, Dr. Stergis opined that Weaver could return to work with a fifty-pound lifting restriction and recommended that he avoid sitting for more than one hour. R. 556–58, 690, 699, 709. Eileen S. Whelan, D.C., suggested surgical consultation. R. 606–07. In January and February 1997, neurosurgeon Benjamin R. Allen, Jr., M.D., examined Weaver and reviewed his MRIs. Although Weaver had a "very large L5-S1 disc," Dr. Allen determined that Weaver looked "quite good at this time" and did not require surgery unless his condition worsened. R. 610–13.

In 1997, Weaver's symptoms flared up, and he walked with a slight limp. Dr. Stergis encouraged Weaver to lose weight and to continue with his lifting restriction. R. 694. He noted that Weaver "show[ed] signs of S1 root irritation and eventually his disc may have to come out." *Id.*[4] By 1998, Weaver was attending physical therapy, exhibiting positive straight leg raises, and walking with a slight stoop. R. 698. A preliminary sleep apnea examination revealed Weaver needed a further sleep study. R. 617. He told Dr. Stergis that he "had to quit his job because of [his] persistent symptoms." R. 702–03. Dr. Stergis noted that Weaver's mental status was normal and his motor exam showed satisfactory strength. R. 695. Dr. Stergis examined Weaver again on September 14, 1998, and recommended that he return to work with a fifty-pound lifting restriction. R. 704–05. Dr. Stergis further noted that since May 1998, Weaver's lumbar spine had been in a weakened condition compared to his pre-injury level. R. 708–10. That same day, Weaver reported to Dr. Stergis that he was experiencing new symptoms in the right lower extremity. R. 711.

---

[4] Dr. Stergis informed Weaver in 1997 that surgery should be reserved only for symptoms that are not medically manageable. *See* R. 690.

In January 1999, Richard R. Eckert, M.D., a neurosurgeon reviewing Weaver's medical record, opined that his impairment was causally related to his 1995 injury. R. 633–37. Dr. Eckert found that Weaver had left lumbosacral radiculopathy, and he opined that Weaver's chronic subjective symptoms correlated with the objective findings. He noted that Weaver had chosen to avoid chronic non-steroidal anti-inflammatory drugs ("NSAIDs") and surgery, which presented some risk, but this decision to limit treatment deprived him of some relief, particularly as Weaver had previously achieved good results from periodic NSAID use. *Id.*

Before releasing Weaver to Dr. Wolanski in 1999, Dr. Stergis noted that Weaver's condition had been "static over many months of observation," and Weaver was "entitled to [a disability] rating." R. 712. He opined that Weaver could lift fifty pounds intermittently, and he noted that Weaver walked with a slightly antalgic gait. He recommended that Weaver continue taking ibuprofen and follow the current work restrictions. The record is sparse until January 4, 2001, at which time Dr. Wolanski opined that he had been seeing Weaver "over the past year and a half for flares of his back pain which began intermittently and then gradually became worse associated with spasm and radiation," with symptoms including tenderness and limited range of motion, but never neurological defects. R. 805. Dr. Wolanski opined that there was little he could offer Weaver from a medical standpoint and referred Weaver back to Dr. Stergis for consideration of further treatment through medication. *Id*

2. *Relevant Medical Records During DIB Coverage Period*

On March 7, 2001, Weaver visited Dr. Stergis complaining of low back pain. Dr. Stergis noted that he had not seen Weaver for two years. Reviewing Weaver's MRI results from that day, Dr. Stergis observed disc herniation at L5-S1 and a bulge at L4-5, which he determined were consistent with prior MRIs from 1995 and 1999. On examination, Weaver walked with a stooped

7

posture, could not walk on his toes, and had "patchy" sensory loss at S1 on the left. R. 741–42.

Dr. Stergis prescribed a trial of Topamax, recommended Weaver consult with a spine surgeon,

and excused Weaver from work for the month of March. R. 740. Stergis referred Weaver to the

Pain Clinic at Culpeper Memorial Hospital. On March 26, 2001, Weaver received an epidural

steroid injection ("ESI"), with a second injection to follow in two weeks. R. 813–14.

Three days later, on March 29, 2001, Weaver visited Dr. Stergis and reported pain in his

lumbosacral region. R. 739. On April 4, 2001, Dr. Stergis examined Weaver and found that his

sciatic problems were only mildly positive. Weaver said he felt much better after ESI treatment.

R. 737. Dr. Stergis opined that Weaver was disabled from March 7 to April 8, 2001, with L5-S1

disc herniation, but able to return to work on April 9, 2001, with lifting restrictions. R. 715.

On April 17, 2001, Susan Anderson, M.D., gave Weaver another ESI and noted that

Weaver's MRI showed disc disease at L4-L5 and L5-S1. Dr Anderson reported that Weaver did

"well from the epidural after about five days of initial discomfort. He did so well that he asked to

go back to work, which Dr. Stergis approved. He has been back at work a week and has noticed

that his stinging and pain is coming back into his groin and down his legs, not beyond his knees."

R. 655–57. Dr. Anderson's examination on April 17, 2001, revealed negative right and left

straight leg raising. She recommended he have another ESI in two to three weeks and not return

to work that night. *Id*.

Weaver visited Dr. Stergis again on April 24, 2001, and complained of continued back

pain, aggravated by sitting. Weaver told Dr. Stergis that he was afraid of losing his job. On

examination, Dr. Stergis observed spasms in the L4-5 and L3-4 regions, positive sciatic stretch on

the left, and chronic lumbar radiculopathy. He excused Weaver from work from April 23 to May

8, 2001. R. 735. Dr. Stergis recommended that he consider myobloc injections for his chronic

8

back spasm. *Id*. On May 9, 2001, Dr. Stergis noted a spasm in the lumbar and iliolumbar paraspinous muscles, positive sciatic stretch on the left, and chronic lumbar radiculitis with low back spasm. He recommended Weaver seek a second opinion from another neurosurgeon because "I [Dr. Stergis] don't think he got a fair assessment with Dr. Ben Allen of Richmond." Dr. Stergis again excused Weaver from work from May 9 through May 31, 2001.  R. 719–20, 733–34.

Returning to Dr. Stergis on May 31, 2001, Weaver was "miserable with pain and afraid that he's going to lose everything" because his worker's compensation payments were not enough to keep up with his bills. Dr. Stergis observed positive sciatic stretch sign and noted that Weaver had lumbar radiculopathy associated with lumbar disc herniation. Finding that other pain medications had been ineffective, Dr. Stergis prescribed MS Contin and excused him from work from May 31 through June 5, 2001. R. 721–22.

On June 5, 2001, Dr. Stergis noted that because Weaver's chronic lumbar radiculopathy with lumbar disc herniation was resistant to conservative treatment, including multiple trials of ESIs, non-steroidal agents, AED medicines, and narcotics, he recommended that Weaver get a second opinion about a surgical intervention from Dr. James Macon of Fredericksburg. R.723–25. Dr. Stergis noted that Weaver was on what he described as total temporary disability due to back pain from June 5 to July 5, 2001. Dr. Stergis made no follow up appointment because "there is nothing further to add at this point." *Id*.

On July 17, 2001, Glenn E. Boley, D.C., a chiropractor, wrote a letter to Wesley G. Marshall, Weaver's worker's compensation attorney, stating that Boley had treated Weaver seven times since June 28, 2001, but had been unable to keep Weaver working because his pain returned easily. Boley asserted that in his "professional judgment, . . . this is a real and physical consequence of his injury." R. 750–51. Boley further stated that, "however, part of the problem is

9

that both diagnosis and treatment have been misdirected toward the lumbar, rather than the pelvic region." *Id.* Consulting with Dr. Stergis, Boley noted that they both determined that further treatment options existed, including Botox injections and manipulation under anesthesia. *Id.*

Returning to Culpeper Regional Hospital on September 24, 2001, and January 15, 2002, Weaver stated that his back injury was getting worse. R. 803–04. On March 3, 2002, Brian A. Casazza, M.D., examined Weaver and noted negative straight leg raising test, intact motor and sensation in the lower extremities, "fairly decent" range of motion in the lumbar spine with some pain on the left, good range of motion in the hips and knees with no pain, and otherwise normal signs. He assessed bilateral lower extremity radiculitis with a history of disc protrusion at L5-S1. Dr. Casazza "doubt[ed] he would be a good surgical candidate at this point considering how long he's had chronic pain. However, I don't think that is a bad idea. Otherwise, I think the best treatment would be to get him in the Pain Management Clinic at UVA. At this point, I don't have anything to offer him for further pain relief." R. 823. Dr. Casazza recommended compressive care and did not think that Weaver would return to a higher level of functioning considering how long he had suffered with this injury. *Id.*

Dr. Wolanski referred Weaver to the Charlottesville Pain Management Center, where on August 5, 2002, Christopher J. Lander, M.D., examined Weaver. He noted pain at L2-L5, lumbar radiculopathy, and no lasting pain relief after either ESI or transforaminal selective nerve root block injection. Dr. Lander completed an epidurogram and ESI at L5-S1 without complication. R. 821. During his physical exam, Weaver displayed normal cardiovascular findings, normal psychiatric/neurological findings, abnormal gait findings, abnormal spine alignment and range of motion, normal tenderness, abnormal spine facet loading and spine flexion with pain, and abnormal soft tissue/ligament sciatic notches. R. 896–901. On August 28, 2002, Dr. Lander

conducted a transforaminal selective nerve root block injection at L4-5. R. 819–20. At a follow-up on November 5, 2002, Dr. Lander did not recommend further injections because Weaver said he did not experience any significant improvement from his recent injections. Dr. Lander recommended a referral for surgical consultation. R. 818.

Weaver visited Greg Helm, M.D., Ph.D., of University of Virginia ("UVA") Health Systems Neurological Surgery, on November 26, 2002. Dr. Helm noted that Weaver had good strength and sensation in his lower extremities, negative straight leg raising test, and normal reflexes, but his 1999 MRI demonstrated several disc bulges. Dr. Helm ordered an additional MRI. R. 817. On December 14, 2002, Maurice Lipper, M.D., reviewed Weaver's MRI and determined that he had multi-level degenerative disease and a L4-5 disc bulge causing moderate central spinal canal stenosis. R. 759–60. Dr. Helm, on December 23, 2002, stated that although Weaver's most recent MRI displayed degenerative changes at L4-5 and L5-S1, the nerve root seemed to be without compression. Dr. Helm also identified some evidence of mild epidural lipomatosis. As a result, Dr. Helm recommended conservative measures. R. 757.

On March 18, 2003, Dr. Helm met with Weaver again for continued low back and anterior lateral thigh pain. Dr. Helm noted that Weaver's MRI "really doesn't look too bad, except for some mild stenosis." R. 756. While Dr. Helm suggested that lumbar decompression would give Weaver a 50/50 chance of improvement, he believed that Weaver wanted to try other measures, such as a weight loss program, first. *Id*.

In April and September 2003, Weaver reported that Bextra helped his back pain, although he still experienced pain flare ups. R. 800. In July 2004, Weaver reported having spasms and persistent back pain that radiated into his thighs. He was continued on Tylenol and Bextra. R. 799. At a follow-up in April 2005, Weaver was still experiencing pain, and he was prescribed a

11

Lidocaine patch and Daypro. R. 798. On December 9, 2005, Dr. Wolanski met with Weaver. Weaver complained of lower lumbar back pain aggravated by lifting, flexion, and twisting. Rest and use of NSAIDs lessened his pain. On examination, Weaver had intact sensation, strength, and reflexes, and exhibited pain at L4-5 and L5-S1 on palpation. Dr. Wolanski prescribed Bextra and referred Weaver to a neurologist. R. 787–89.

On July 26, 2006, Nancy Schmitz, M.D., treated Weaver for a right shoulder injury suffered while operating a tractor. Weaver said that he was bush hogging on a tractor when something flew up and hit him in the back of his right shoulder. Dr. Schmitz noted no medical findings relevant to Weaver's chronic back pain. R. 785–86.

On November 28, 2006, Walter N. Rabhan, M.D., of Tuckahoe Orthopedic Associates, LTD, performed an independent medical evaluation of Weaver. R. 790–92. Dr. Rabhan noted that Weaver exhibited negative straight leg raising to ninety degrees without discomfort, no pain on rotation of the hips, excellent strength in his lower extremities, no tenderness in the sciatic notches, and only mild discomfort on flexion and extension of the lumbar spine. Weaver had normal gait and could toe and heel walk without difficulty. He had normal lower extremity strength, no spasm, and no trigger points. Dr. Rabhan asserted that although Weaver's MRIs showed disc protrusion at L5-S1, "my impression is that Mr. Weaver has reached maximum medical improvement and the only abnormality that I could discern on exam today along with MRI findings was the mild to moderate disc protrusion at L5-S1. I think he can be gainfully employed and would recommend a job that requires no repetitive bending at the lumbar spine and no lifting over 20 pounds. I also feel that Mr. Weaver can work an eight hour day, forty hours per week." *Id.* Dr. Rabhan assessed that Weaver had 3% whole-person impairment secondary to the central disc bulge at L5-S1. *Id.*

3.      *Records After Date Last Insured*

On February 23, 2007, Ravi M. Giyanani, M.D., stated that Weaver had moderate disc space narrowing from degenerative disc disease at C5-6, but no other focal bony abnormalities were seen in the cervical spine. R. 795–96. Dr. Giyanani found degenerative disc disease causing disc space narrowing at L3-4 and probably also at L2-3. *Id.*

Examining Weaver on January 31, 2007, Dr. Wolanski noted that Weaver was depressed and still had low back pain, tender lipomas in both sacral areas, and limited range of motion. Dr. Wolanski stated that although his medical scans showed no obvious source, Weaver clearly had pain. He opined that it was unlikely Weaver would ever return to work. R. 781. In March 2011, Dr. Wolanski again opined that Weaver would be unable to resume employment, noting that pain prevented him from working for more than a few hours, especially if it involved lifting more than ten to twenty pounds or twisting. R. 870.

On January 2, 2014, Dr. Wolanski examined Weaver and noted that the duration of Weaver's symptoms, his poor physical functioning, and the loss of his job, house, and wife—all seemingly related to his back—led him to conclude that Weaver was chronically disabled and would never be gainfully employed. R. 887–88. He also completed a Disability Form for the period of March 1, 2001, to December 31, 2006, and opined that Weaver 1) could sit for twenty minutes before needing to stand up, walk around, or lie down; 2) needed to stand up, walk, or lie down for twenty minutes before resuming a sitting position; 3) could stand for one hour before needing to sit down, walk, or lie down; 4) could walk for twenty minutes before needing to sit, lie down, or stand; 5) needed to take unscheduled breaks during an eight-hour work day, roughly eight times per day lasting an average of twenty minutes to lie down or sit quietly during breaks; 6) needed to lie down or recline less than one hour during an eight-hour work day; 7) could

13

occasionally lift and carry ten pounds, rarely lift fifteen pounds, and rarely carry twenty pounds; 8) had significant limitations reaching, handling, or fingering; 9) could reach overhead 10% of the workday with his right and left hand; and 10) had no ability to climb. Additionally, during a typical workday Weaver's pain would be severe enough to interfere with attention and concentration needed to perform simple work tasks frequently, and he would be off task more than 30% of the time, be absent from work more than five days a month, be unable to complete a normal workday more than five days a month, and work at less than 50% efficiency. R. 889–92.

William Amos, M.D., reviewed Weaver's medical records for DDS. He found that Weaver was limited because of constant pain, but was nonetheless able to perform light work and frequently engage in all postural activities, except stooping, which he could perform occasionally. R. 149–60. On reconsideration, R.S. Kadian, M.D., made the same findings. R. 171–72.

In his Pain Questionnaire, dated October 15, 2015, Weaver stated that since 1995 his pain had been "aching, stabbing, burning, and throbbing" and sometimes moved from the lower back down his left or both legs. In addition, he claimed that his medications caused side effects, such as drowsiness, nausea, and loss of coordination. R. 429–30. In a Function Report, Weaver stated that he lives alone in his house and he handles his personal hygiene needs, checks on his father, helps with his father's animals and farm needs, and prepares pre-packaged meals on a daily basis. R. 447–454. He also stated that any activity involving stooping causes pain and that he cannot sleep well. Weaver reported that after his injury, it was "very difficult to do most work." He could drive himself, and he shopped in stores for food one to two times a week, but he could lift only twenty pounds and could not stand or sit for more than one hour continuously. *Id*.

At the remand hearing in 2014, Weaver testified that he stopped working after he injured his back and was unable to continue performing all of his job duties because of back pain. R. 111.

He testified that his pain limited his activities and affected his relationships. R. 112–13. He had difficulty bending, crouching, kneeling, squatting, and stooping, as all of those activities caused pain. R. 116. He could sit in a cushioned chair for a half hour to an hour before he needed to change positions or stand and walk around. R. 116–17. He would not be able to sit again for an hour or two. R. 117. He could stand for three to four hours before his pain became intolerable. R. 118.

Hayden Alexander, M.D., a medical expert, also testified. He found that Weaver had severe degenerative disc disease of the lumbar spine since 1995. R. 122. Additionally, Dr. Alexander testified that "all things considered, I think he can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently" and "he can certainly sit, stand and walk four out of eight hours of each one of those activities, and sustained sitting would be 30 minutes, standing would be 30 [minutes] and walking for 30 minutes at a time, sustained per hour." R. 124–25. He opined that a sit/stand option at work would allow Weaver to change positions to accommodate his back problems. R. 125. Dr. Alexander testified that Weaver could stand, walk, and sit for a total of eight hours in a workday. R. 125, 128. Additionally, he stated that Weaver could not climb ropes, ladders, or scaffolding, and he could occasionally crouch, kneel, crawl, and climb stairs and ramps, but he had no reaching or manipulation limitations. R. 126, 128–29. Finally, Dr. Alexander noted that Weaver should not be exposed to unprotected heights. R. 126.

## IV. Discussion

Weaver argues that the ALJ's determination that he was not disabled during the period at issue is not supported by substantial evidence because the ALJ's RFC finding and concomitant hypothetical did not include all of Weaver's documented functional limitations. Pl. Br. 3–4, ECF No. 15. Specifically, he argues that the ALJ gave insufficient weight to the medical opinion

offered by Weaver's treating physician, Dr. Wolanski, Pl. Br. 5–13, and that the ALJ erred by discrediting Weaver's testimony regarding his subjective symptoms, Pl. Br. 13–17.

*A.      Credibility*

ALJs follow a two-step process for evaluating a claimant's allegation that he is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart*, 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. § 404.1529). The ALJ must first determine whether objective medical evidence[5] shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. 20 C.F.R. § 404.1529(a); *see also Craig*, 76 F.3d at 594. If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects his physical or mental ability to work. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *see also Craig*, 76 F.3d at 595.

The second-step in the analysis often requires the ALJ to determine "the degree to which the [claimant's] statements can be believed and accepted as true." SSR 96-7p, 1996 WL 374186, at *2, *4. The ALJ cannot reject the claimant's subjective description of his pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 404.1529(c)(2); *see also Hines*, 453 F.3d at 563–64. The ALJ must consider "all the available evidence" in the record, including the claimant's statements, his treatment history, and the objective medical evidence. 20 C.F.R. § 404.1529(c).

---

[5] Objective medical evidence is any "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. § 404.1528(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* § 404.1528(a).

The ALJ must give specific reasons, supported by relevant evidence in the record, for the weight assigned to the claimant's statements. *See Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015); *Eggleston v. Colvin*, No. 4:12cv43, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013) (citing SSR 96-7p, at *4). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). "Exceptional circumstances include cases where a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Edelco*, 132 F.3d at 1011.

At the beginning of his RFC analysis, the ALJ reviewed Weaver's statements about his functional limitations. R. 26–27. In assessing Weaver's credibility, the ALJ focused primarily on two areas: mixed findings on exam and conservative treatment. He concluded that Weaver's impairments could reasonably be expected to cause his alleged symptoms, but his statements concerning the intensity, persistence and limiting effects of his symptoms were not credible.[6] R. 33. Reviewing the exam findings, the ALJ noted that Weaver's treating physicians assessed varying results on straight leg raising tests; mostly normal gait; spasms; some sciatic problems; normal joint and spine range of motion, extremity strength, and sensation; and mild degenerative changes of his lumbar spine. R. 33–34.[7] Based on these medical findings, the ALJ reasoned that Weaver's impairments were not as severe as he claimed. R. 34. The ALJ's findings are supported

---

[6] The ALJ's analysis is backward as he "should have compared [Weaver's] alleged functional limitations from pain to the other evidence in the record, not to [Weaver's] residual functional capacity." *Mascio*, 780 F.3d at 639. This error was harmless because the ALJ properly analyzed Weaver's credibility elsewhere in his opinion. *See id.*

[7] Throughout the opinion, the ALJ at times cites the wrong year for treatment records. For example, he cites records from May and June 2011, which actually are from May and June 2001. R. 33, 721, 725. These errors did not impact the ALJ's analysis of the record and are just typographical errors.

17

by the record. For example, Dr. Allen in 1997 and Dr. Helm in 2002 assessed Weaver for surgery to relieve his back pain. Based on their physical exams of Weaver and the imaging of his spine, these two neurosurgeons opined that Weaver had mild degenerative changes to his lumbar spine. Additionally, although Dr. Wolanski observed that Weaver experienced chronic pain, he nonetheless acknowledged that he could not identify its source.

A factor, though not itself determinative, in the credibility assessment is whether the objective evidence shows an impairment that could cause the severity of the pain. A claimant's allegations of pain "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers." *Craig*, 76 F.3d at 595. The ALJ reached a different conclusion than Dr. Wolanski about the severity of Weaver's complaints of pain, but he nonetheless acknowledged Weaver's complaints of pain and, in his RFC assessment, accounted for them to a degree. Evidence that Weaver experienced a degree of pain, however, does not establish that he is disabled. *See Hays*, 907 F.2d at 1457–58 ("An individual does not have to be pain-free in order to be found 'not disabled.'"). The ALJ's assessment of the medical evidence is balanced and reasonable, and it is supported by the evidence.

The ALJ also discussed Weaver's history of treatment. He noted that over the course of five years, Weaver was treated with medications, ESIs, nerve root blocks, and chiropractic care. R. 34. These treatments had mixed results, sometimes affording pain relief. When Weaver was referred to a neurosurgeon in 2002, Dr. Helm determined that conservative options, including weight loss, offered a better chance for relief than surgery. The ALJ did not express doubt that Weaver experienced pain; he did question the severity of his symptoms based on the treatment he

18

received. Weaver's treatment history certainly depicts a person seeking pain relief. But the nature of that treatment and the partial pain relief afforded by conservative measures provide grounds for the ALJ to question the severity of Weaver's symptoms.

Weaver argues that his good work history supports the credibility of his symptoms. A claimant's work history is a factor that the ALJ may consider in assessing his credibility, but where, as here, the ALJ provides legitimate reasons to question the severity of a person's report of symptoms, a good work history will not overcome those reasons. *Wheeler v. Colvin*, Civ. A. No. 1:13-445-RMG, 2014 WL 2157458, at *15 (D.S.C. May 23, 2014); *see also Jeffries v. Astrue*, Civ. No. 3:10-cv-1405, 2012 WL 314156 at *25 (S.D. W. Va. Feb. 1, 2012) ("The requirement that the ALJ make a credibility determination based on [the objective medical findings, the evidence of record, and a claimant's testimony and conduct at the administrative hearing] would be meaningless if a long work history standing alone established 'substantial credibility.").

Considering the objective evidence and Weaver's course of treatment, the ALJ could reasonably question the severity of his symptoms related to pain. This case does not present the exceptional circumstance of an ALJ's credibility determination that is based on unreasonable, contradictory, or inadequate findings. Accordingly, I find that substantial evidence supports the ALJ's credibility determination.

B.    *Medical Opinions*

Weaver also challenges the ALJ's decision to give "little weight" to the opinion of his treating physician, Dr. Wolanski. The record contains medical opinions from a number of treating, examining, and consulting physicians. The ALJ discussed each of these medical opinions, and his analysis of all of the opinions augments his analysis of each individual opinion as well as his RFC assessment.

19

The ALJ adopted Dr. Alexander's opinion, to which he assigned "great weight." R. 35. Dr. Alexander, who testified at the administrative hearing as a medical expert, opined that Weaver could perform light work and sit, stand, or walk for eight hours in a normal workday as long as he could change positions every thirty minutes. Additionally, Dr. Alexander found that Weaver was precluded from or limited in engaging in postural activities. The ALJ noted that at the hearing Dr. Alexander detailed his reasons for these findings, focusing on his review of the objective medical evidence in the record. R. 26–27, 35; *see also* R. 122–24. Although Dr. Alexander did not examine or treat Weaver, ALJ Rippel determined that his opinion "appears to adequately balance the claimant's pain complaints with his mixed findings, including mainly straight leg raise testing with intact neurological signs on exam, and conservative treatment." *Id*.

The ALJ also discussed the DDS physicians' opinions that Weaver could perform light work. R. 35. He found that the "lifting and carrying limitations appear to appropriately reflect [Weaver's] functioning, given [the] few upper extremity signs on exam," but also noted that these opinions "did not full[y] account for his continued radiculopathy complaints, reports that he needed to shift between sitting and standing, and his occasional sensory disturbances that affected his postural activities and exposure to unprotected heights." R. 35. As a result, ALJ Rippel gave these opinions only some weight.

The ALJ offered a similar assessment of Dr. Rabhan's opinion. Dr. Rabhan examined Weaver in 2006 as an independent medical consultant, and he found that Weaver could lift no more than twenty pounds and could not repetitively bend at the waist. The ALJ noted Dr. Rabhan's physical examination findings, but found that his assessment of limitations did not account for Weaver's radiculopathy complaints; thus, he gave the opinion "some weight." R. 35.

20

ALJ Rippel also discussed the treating chiropractor Boley's July 2001 opinion that Weaver was unable to work. R. 29. ALJ Rippel gave his opinion little weight because Boley was not an acceptable medical source, he had examined Weaver only seven times in 2001, and his findings were not consistent with Weaver's "limited treatment and mixed physical findings on exam." R. 35.

ALJ Rippel considered the opinions of Dr. Stergis and Dr. Anderson from March 2001 through May 2001, when Weaver was often excused from his job. R. 36. He noted, however, that because these opinions either "apply only to [Weaver's] current job at the time or are not supported by the claimant's mixed signs on exam with limited and conservative treatment," he gave these opinions "little to no weight." *Id.*

The ALJ also considered opinions regarding Weaver's past restrictions and work limitations from physicians and a chiropractor dated from his 1995 injury through 1999, and opinions from his treating physician in 2011 and 2012. ALJ Rippel determined that "these [opinions] were formed either several years before the claimant's alleged onset date in 2001 or several years after his date last insured in 2006" and gave these opinions "no weight with regards to the current disability application with[in] relevant period." *Id.*

ALJ Rippel considered the opinion of Weaver's treating physician, Dr. Wolanski, and gave "no weight" to his December 2005 opinion and "little weight" to his January 2014 opinion. In December 2005, Dr. Wolanski noted that Weaver was completely disabled from his back injury. *Id.* The ALJ found that this opinion was "inconsistent with the claimant's full muscle strength and joint range of motion, intact neurovascular exam, and limited and conservative treatment at the time without use of an assistive device for ambulation." He gave this opinion "no weight." *Id.* ALJ Rippel also considered Dr. Wolanski's January 2014 opinion regarding

21

Weaver's functioning between 2001 and 2006. ALJ Rippel explained that "Dr. Wolanski is a family physician, not a neurosurgeon or orthopedic surgeon. In addition the treatment notes essentially show mainly negative straight leg raise testing, full strength, and limited sensory deficits on exam throughout the relevant period." *Id*. He further explained that Dr. Wolanski's January 2014 opinion "relies heavily on the claimant's subjective complaints, particularly as the claimant['s] treatment was conservative with no referrals to surgery or prescriptions of assistive devices to aid in ambulation, and the claimant's diagnostic findings were mild to moderate at worst." As a result, ALJ Rippel gave this second opinion "little weight." R. 35.

Agency regulations instruct ALJs to weigh each medical opinion[8] in the applicant's record. 20 C.F.R. § 404.1527(b). The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical consultants. *See id*. § 404.1527(c). A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. § 404.1527(c)(2). An ALJ may reject a treating physician's opinion in whole or in part if there is "persuasive contrary evidence" in the record. *Hines*, 453 F.3d at 563 n.2; *Mastro*, 270 F.3d at 178; *Tucker v. Astrue*, 897 F. Supp. 2d 448, 465 (S.D. W. Va. 2012).

The ALJ must "give good reasons" for discounting a treating physician's medical opinion. 20 C.F.R. § 404.1527(c). He also must consider certain factors in determining what weight to give that opinion, such as the length and nature of the doctor-patient relationship, the weight of the

---

[8] "Medical opinions are statements from . . . acceptable medical sources that reflect judgments about the nature and severity of [the applicant's] impairment(s)," including: (1) the applicant's symptoms, diagnosis, and prognosis; (2) what the applicant can still do despite his or her impairment(s); and (3) the applicant's physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2).

evidence supporting the opinion, the physician's medical specialty, and the opinion's consistency with other evidence in the record. *See id.*; *Clausen v. Astrue*, No. 5:13cv23, 2014 WL 901208, at *9 (W.D. Va. Mar. 7, 2014). That obligation is satisfied when the ALJ's decision indicates that he considered the required factors. *Burch v. Apfel*, 9 F. App'x 255, 259 (4th Cir. 2001) (per curiam); *see also Vaughn v. Astrue*, No. 4:11cv29, 2012 WL 1267996, at *5 (W.D. Va. Apr. 13, 2012), *adopted by* 2012 WL 1569564 (W.D. Va. May 3, 2012). The ALJ must consider the same factors when weighing medical opinions from non-treating sources. 20 C.F.R. § 404.1527(c), (e)(2).

Weaver argues that the ALJ did not properly evaluate the medical opinion evidence factors and gave inadequate reasons for discrediting Dr. Wolanski's opinion. Although the ALJ acknowledged that Dr. Wolanski was a treating physician, he also noted that Dr. Wolanski was a family practitioner, not a specialist.

The ALJ also asserted that Dr. Wolanski appeared to rely on Weaver's subjective report of symptoms. Weaver argues that this finding is based on conjecture. He also argues that Dr. Wolanski, like any treating physician, should consider his patient's subjective complaints. This is undoubtedly true, and Dr. Wolanski regularly recorded Weaver's complaints of pain and his reports of limitations. *See, e.g.*, R. 887 (noting, on the day he completed Weaver's functional assessment, that Weaver's "pain worsens with walking, back flexion, twisting movements, and lifting objects"). An ALJ nonetheless may question a physician's opinion that relies on a patient's report of symptoms, especially where the ALJ has found the patient's statements regarding the intensity of his symptoms to be less than credible. *See Morris v. Barnhart*, 78 F. App'x 820, 824 (3d Cir. 2003) (an ALJ may properly discredit a physician's findings that were premised largely on the claimant's own accounts of his symptoms and limitations when the claimant's complaints

23

are properly discounted). The ALJ found here that the medical evidence was at odds with Weaver's report of symptoms.

MRIs of Weaver's lumbar spine showed degenerative disc disease and disc bulges at L4-5 and L5-S1, but not nerve root compression. R 756, 759–60, 781. Dr. Helm, a neurosurgeon, commented that Weaver's MRI "really didn't look too bad, except for some mild stenosis." R. 756. During the relevant period, examinations by Weaver's neurologist, pain management specialist, and neurosurgeons generally revealed full muscle strength, normal range of motion, normal reflexes, and negative straight leg raise tests, and on most exams a normal gait. R. 742, 758, 791, 813, 828. Considering these normal to mixed objective findings, the ALJ could reasonably determine that this medical evidence contradicted Dr. Wolanski's opinions.

Weaver also asserts that ALJ Rippel erred in characterizing his treatment as conservative. Weaver argues that he did not undergo surgery because he was not a good surgical candidate. Pl. Br. at 9. Weaver correctly notes that Dr. Helm opined that given his chronic pain, surgery offered only a 50/50 chance of relief. As noted above, Dr. Helm also assessed mostly normal or mild findings on exam and recommended that Weaver pursue conservative measures such as weight loss. Dr. Allen made similar findings and offered a similar recommendation in 1997. The ALJ determined that Weaver's physicians' recommendations of measures other than surgery demonstrated that his back impairment did not cause limitations as severe as Weaver claimed. Considering all of Dr. Helm's statements, the ALJ could reasonably interpret his assessment of the chances of surgery successfully relieving Weaver's pain as an expression that Weaver's condition was not serious enough to warrant surgery.

In an analysis similar to his credibility finding, the ALJ reviewed Weaver's treatment and the objective medical evidence and determined that they did not support the restrictions identified

24

by Dr. Wolanski. This evidence, the other medical opinions in the record, and the ALJ's discussion of those opinions provides substantial evidence for the ALJ's decision to assign "little weight" to Dr. Wolanski's opinion. *See Hines*, 453 F.3d at 563 n.2 (An ALJ may reject a treating physician's opinion in whole or in part if there is "persuasive contrary evidence" in the record.).

In assessing Weaver's RFC, the ALJ essentially adopted Dr. Alexander's limitations. The ALJ credited Weaver's complaints of pain to a degree by accounting for Weaver's need to shift positions with a sit/stand option every thirty minutes and by eliminating most postural activities to address Weaver's report of radiculopathy. Weaver's RFC reflects the ALJ's assessment of Weaver's credibility and the medical opinions, and the hypothetical that the ALJ presented to the VE accurately presented this RFC. Based on the VE's testimony, which Weaver does not challenge, the ALJ found that Weaver could perform other work in the economy. I find that this determination is supported by substantial evidence.

## V. Conclusion

This Court must affirm the Commissioner's final decision that Weaver is not disabled if it is consistent with the law and supported by substantial evidence in the record. The Commissioner has met both requirements. Accordingly, the Court will **GRANT** the Commissioner's motion for summary judgment, ECF No. 17, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's docket. A separate Order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to the parties.

ENTER: September 13, 2016

Joel C. Hoppe
United States Magistrate Judge

25